UNITED STATES of America,
Appellee,

v.

Robert William GORMAN and Edward
Terrence Roche, Appellants.

No. 97, Docket 29709.

United States Court of Appeals
Second Circuit.

Argued Oct. 1, 1965.

Decided Dec. 7, 1965.

Thomas D. Clifford, New Haven, Conn., for appellant Robert William Gorman.

Gregory P. Patti, Bridgeport, Conn. (Paul V. McNamara, Bridgeport, Conn.), for appellant Edward Terrence Roche.

Howard T. Owens, Jr., and Samuel J. Heyman, Asst. U. S. Attys. (Jon O. Newman, U. S. Atty., District of Conn.), for appellee.

Before FRIENDLY and KAUFMAN, Circuit Judges, and HERLANDS, District Judge.*

FRIENDLY, Circuit Judge:

Gorman and Roche appeal from a judgment of the District Court for Connecticut convicting them, after a jury

---

* Of the Southern District of New York, sitting by designation.

trial, of robbing the Connecticut National Bank in Ridgefield, which is insured by the Federal Deposit Insurance Corporation. See 18 U.S.C. § 2113(a) and (b).

The Government's evidence was not merely sufficient but overwhelming. The manager and the bank teller identified Gorman and Roche as the men who had robbed the bank at gunpoint, as did an employee of a store next door. Gorman was found in the Bronx on the night of the robbery with an attaché case containing a revolver and $26,000 of currency stolen from the bank; Roche was located on Long Island the next day with a gun in an attaché case and some $35,000 of stolen bills. In addition the jury had before it testimony as to an oral confession by Gorman and an identification by him of Roche as his accomplice. Gorman offered no evidence in defense; Roche testified that the luggage in which the stolen money was found in his hotel room had been left there by Gorman. The numerous points on appeal concern an incident that arose early in the trial and the admissibility of evidence material to the Government's case. We affirm the convictions.

### I.

Both defendants urge that a mistrial should have been granted because a wrong indictment was read to the jury. Immediately after the jury was impaneled, the judge said he wished to explain the case being tried. He stated that one indictment charged Gorman and Roche with the substantive crime of taking money by force and violence from a bank at Ridgefield on September 8, 1964, and another with conspiring to do so.[1] He went on to say that a third indictment charged a similar substantive crime with respect to a Greenwich bank on April 22, 1964. The prosecutor immediately asked leave to approach the bench, and the judge stated, after discussion:

> It has come to my attention that these men are not being charged with a bank robbery in Greenwich.

The only way I can explain it is that the indictment is right here in front of me, and I read from the indictment. I will decide what to do about it after I excuse the jury from the room.

When court reassembled, defense counsel moved for a mistrial. The judge denied the motion but instructed the jury that it must "totally disregard the mention by the Court of what happened in Greenwich, because as far as we are concerned, nothing happened in Greenwich concerning these defendants." He repeated this several times, also explaining that the Greenwich indictment had been "inadvertently put on the bench" by someone and that he ought not to have read from it.

We are at a loss to understand why the judge did not proceed to cure the error, made so early in the trial, by granting defendants' motion and immediately impaneling another jury; the time that would have been lost in doing this was inconsequential as compared to the risk of a reversal—a course we might well have felt compelled to take if the case had proved to be a close one. Despite the comforting assurance in Delli Paoli v. United States, 352 U.S. 232, 242, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), we cannot deny the force of the contention that the jury could hardly have been expected to comply with the judge's direction altogether to erase the reading of the Greenwich indictment from their minds. We can fairly assume, however, that what the jury would remember was only that Gorman and Roche had been *accused* of another robbery. The impact of that recollection would have been largely blunted by the judge's careful and thorough instruction, in connection with the crime charged, that an indictment "is to be accorded no weight" in determining guilt or innocence. Refusal to order a mistrial for admitting evidence of a crime not charged in the indictment has been held not to require reversal when the er-

[1]. During the trial the conspiracy indictment, which had been consolidated for trial with the substantive indictment, was dismissed at the Government's request.

ror was inadvertent and the other evidence of guilt was "so strong that it is unbelievable that a rational jury would have acquitted if this error had not occurred." United States v. Tramaglino, 197 F.2d 928, 932 (2 Cir.), cert. denied, 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952). That is the situation here, if, as we hold, the challenged evidence was properly received. Applying the test of harmless error, 28 U.S.C. § 2111, we conclude that under the circumstances the judge's mistake in referring to the Greenwich indictment "did not influence the jury, or had but very slight effect," and that the substantial rights of the defendants were not infringed. See Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

## II.

We next consider Gorman's claims that he was unlawfully arrested, that the search which produced the evidence used against him was illegal, and that his confession was unlawfully obtained. The lawfulness of the arrest is important because it provided the basis both for a search leading to discovery of a gun and a large sum of stolen currency and for the detention during which Gorman made his confession, see Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963).

The facts surrounding the arrest were determined by the judge after a hearing on a pretrial motion to suppress: In the evening of September 8, 1964, three detectives of the New York City Narcotics Bureau, while patrolling in the Bronx, observed two known addicts enter an automobile operated by Gorman. The auto drove away and then stopped on a narrow sidestreet not used as a public thoroughfare. The detectives saw Gorman leave the car, raise the hood and twice open and close the trunk. Suspecting that the occupants of the car were using narcotics, the officers approached from different positions and saw Gorman injecting himself with a hypodermic needle. A detective walked up to the car, ordered the occupants to stay where they were, reached into it to remove the needle from Gorman's arm, and placed him under arrest for violation of § 1747–d of the N. Y. Penal Law, McKinney's Consol.Laws, c. 40.[2] After searching the interior of the car, the detectives directed Gorman to open the trunk in order to ascertain what he was "doing in there before." They discovered an attaché case containing a revolver and a large sum of money, later found to have been stolen from the Ridgefield bank. Gorman identified himself as James Connor of Connor and Noel Surgical Instrument Company, Houston, Texas, and insisted he had drawn the money from a bank to purchase equipment for the company. Shortly afterwards he changed his story, claiming that the money came from a burglary in Houston, and offered the detectives $10,000 to let him go.

Gorman argues that the arrest was unlawful and that, even if it was valid, the subsequent search violated the Fourth Amendment because, with the automobile in possession of the police, a search warrant should have been obtained. We need not tarry over the first argument since it is based on challenges to the testimony of the detectives which cannot be sustained over the findings of the trial judge who, having seen and heard the witnesses, was justified in accepting the version offered by the prosecution; on these facts, the arrest was lawful under § 177 of the New York Code of Criminal Procedure. In his attack upon the validity of the ensuing search, Gorman does not seriously dispute that the search of the trunk came within the oft-quoted language in Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925), relied on in United States v. Rabinowitz, 339 U.S.

2. The statute (which subsequently was renumbered § 1747-e) makes it a misdemeanor for any person, except for obvious exceptions, "to have under control or possess, a hypodermic syringe or hypodermic needle, or any other instrument or implement adapted for the administering of narcotic drugs," without proper authorization from a physician or veterinarian.

56, 61, 70 S.Ct. 430, 433, 94 L.Ed. 653 (1950), upholding a search of "the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody * * *." His contention is rather that these cases upholding the validity of such searches have been undermined by the more recent decisions in Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), and Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). We find no basis for so concluding, despite statements in concurring and dissenting opinions in Chapman, 365 U.S. at 618, 621–623, 81 S.Ct. at 780–781, rarely a safe guide to the holding of the majority. The Chapman case did not present the issue of a search incident to a lawful arrest. Preston, which did, cited the Rabinowitz decision,[3] but proceeded on the ground that "[o]nce an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." 376 U.S. at 367, 84 S.Ct. at 883, accord, James v. State of Louisiana, 86 S.Ct. 151 (Oct. 18, 1965); and the Court assumed that "the police had the right to search the car when they first came on the scene," 376 U.S. at 367–368, 84 S.Ct. at 883. The rule that officers making a valid arrest of one or more occupants of an automobile can, without a warrant, then and there search the car including its trunk is reasonable not only because of necessity in many cases but because a speedy search may disclose information useful in tracking down accomplices still on the move. Although the narcotics offense for which Gorman and his associates here were arrested may not have been of the sort where such considerations are of great importance, it is undesirable to impose exceptions, necessarily difficult in practical application, on a rule so long established and so clearly understood by the police. Like the Court of Appeals for the District of Columbia, we are unpersuaded of the necessity, or the wisdom, of qualifying the rule so as to require officers lawfully arresting occupants of an automobile to make a considered and correct on-the-spot determination whether the circumstances of the arrest might render it feasible to secure a warrant before searching the car. See Adams v. United States, 118 U.S.App. D.C. 364, 336 F.2d 752 (1964), cert. denied, 379 U.S. 977, 85 S.Ct. 676, 13 L.Ed. 2d 567 (1965).

Gorman's final point concerns the receipt of an oral admission of the crime to an agent of the FBI. Upon arrival at the police station at approximately 9:30 P.M., Detective Cuomo, while counting the seized money, came upon wrappers marked "Connecticut State Bank, Ridgefield, Connecticut." On being confronted with these, Gorman declared:

I might as well tell you the truth. I stuck up a bank in Connecticut. This is the money from the bank stick-up.

Around 11:30 P.M. Gorman was placed in a detention cell and was not questioned further until 4:00 A.M. the following morning, when he was interviewed for about two hours by a New York assistant district attorney. Although advised by the latter of his constitutional rights, Gorman again admitted participation in the robbery. Around 6:30 A.M. Gorman was questioned by FBI agents, who had arrived at the station house two hours earlier. Agent Wickman advised him that he had a right to counsel, that he was not required to say anything, and that whatever he did say could be used against him in court; the agent also told him that he had a right to call a relative or attorney and that a telephone was available for that purpose. Declining the offer, Gorman made a detailed confession

---

3. See also the approving citation of Rabinowitz in Ker v. State of California, 374 U.S. 23, 41–42, 83 S.Ct. 1623, 1634, 10 L.Ed.2d 726 (1963) (opinion of Mr. Justice Clark), where it was said: "The practicability of obtaining a warrant is not the controlling factor when a search is sought to be justified as incident to arrest * * *."

how, along with another man, he had committed the Ridgefield bank robbery; he refused to sign a written statement. At approximately 8 A.M. he was taken to downtown Manhattan to be photographed, after which he was brought to the Bronx Criminal Courthouse for arraignment on the state charges; because of the pressure of business, this could not be done until 2:30 P.M. After the state arraignment, he was turned over to the federal authorities who had him fingerprinted, photographed and placed in a line-up, and then arraigned before a United States Commissioner at about 4 P.M.

■ Gorman's challenge to the receipt of Agent Wickman's testimony of his confession rests on several grounds. We can rapidly pass over his contention that, because of the length of his detention and his allegedly being under the influence of narcotics, his confession should have been excluded as involuntary on general considerations of due process. The judge heard the conflicting testimony as to Gorman's physical condition and was justified in concluding that the statement to the federal agents was a voluntary admission, the product of a considered choice. We need say little more as to the contention that the confession was obtained during an illegal detention in violation of F.R.Crim.P. 5(a) and therefore must be excluded under the rule of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). Since there is no possible basis for concluding that Gorman's arrest was the result of a "working arrangement" between federal and state authorities, see United States v. Coppola, 281 F.2d 340 (2 Cir. 1960), aff'd, 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79 (1961), there can have been no violation of the Federal Criminal Rule. Moreover, even if we were to consider the case as if the federal detention had commenced when the FBI agents first saw Gorman, the admission to Agent Wickman was made almost immediately after the beginning of the interrogation, when the full story of the nature and extent of the crime had not yet been developed. See United States v. Hall, 348 F.2d 837, 842–843 (2 Cir. 1965); contrast United States v. Middleton, 344 F.2d 78 (2 Cir. 1965). As for the delay in federal arraignment, it seems to have been unavoidable, and in any event was inconsequential since the confession preceded the delay and thus could not have been its fruit. United States v. Mitchell, 322 U.S. 65, 70–71, 64 S.Ct. 896, 88 L.Ed. 1140 (1944).

What requires more discussion is the argument that even though Agent Wickman's clear warnings and his offer of the use of the telephone woud have sufficed to protect Gorman's constitutional rights had the FBI interrogation stood alone, the confession to Wickman was the poisoned fruit of Gorman's earlier admission to Detective Cuomo, which had been obtained before any warning.[4] Assuming that any sins of state police officers in this regard will be visited on a federal prosecution, see Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), we reject Gorman's claim on two independent grounds.

■ In the first place, for reasons indicated in United States v. Cone, 354 F.2d 119 (2 Cir. 1965), and United States v. Robinson, 354 F.2d 109 (2 Cir. 1965), we hold that Detective Cuomo's brief questioning without warning Gorman that he need not respond and could seek the advice of counsel did not deny his right to counsel guaranteed by the Sixth Amendment or violate his constitutional privilege against self-incrimination. When Gorman arrived at the police station, he was not merely not an "accused" as to the Ridgefield robbery, in the language of the Amendment, but was not even a suspect, since the New York detectives did not yet know of that crime. Suspicion, or something

---

4. Pursuant to a ruling by the judge on a pretrial motion to suppress, neither this nor the statement to the state assistant district attorney was offered in evidence.

more, did indeed focus on him when the currency he claimed to have stolen from a Houston bank turned out to have Ridgefield wrappers. But even then, from the standpoint of the Sixth Amendment, Detective Cuomo's spontaneous request for an explanation was as investigative as anything could be; he was bound to inquire as to the facts in order to ascertain what other persons might be involved and where they and the stolen money might be found. Compare United States v. Hall, supra, 348 F.2d at 843. The case lies nearly at the opposite end of the spectrum from Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), where the prosecutor took a detailed statement of the defendant's guilt after a night of detention and sustained interrogation. While preliminary questioning after an arrest generally has some "accusatory" element, and even prolonged grilling to extract a confession of a crime already solved may have a modicum of "investigative" purpose, the Escobedo decision teaches only that the guarantee of the assistance of counsel applies in the latter situation— one far removed from the facts in this case. As for violation of the privilege against self-incrimination, while we assume that the protection of the self-incrimination clause extends beyond statements elicited by officers having power of testimonial compulsion, see my concurring opinion in United States v. Cone, supra, 354 F.2d at 129, some showing of compulsion is nonetheless required. Although the circumstances of detention that will cause police interrogation to be branded as sufficiently coercive to invoke this constitutional guarantee have yet to be precisely defined, we find no basis for believing that the point has been reached where any statement made while under arrest or detention is to be considered as compelled in the sense prohibited by the self-incrimination clause. See Culombe v. Connecticut, 367 U.S. 568, 576, 578–580, 588–592, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (opinion of Mr. Justice Frankfurter). Here there was no grilling of Gorman; Detective Cuomo's inquiry and Gorman's response evolved in a natural way from the detective's discovery that the wrappers identifying the seized money did not correspond with Gorman's prior explanation. We see no reason for straining to find a *per se* compulsion, irrespective of actual facts, as to all statements made while under arrest or detention.

In the alternative we hold that the district judge was warranted in finding the detailed statement to Agent Wickman not to have been so causally related to the brief admission of guilt to Detective Cuomo as to be vitiated by infirmity in the latter, if infirmity there was. Gorman's case is quite different from the situation in which, after a first confession has been extracted from a man previously professing innocence by means calculated to break his will, a second confession is more politely secured. In such a case, there is a strong basis both in logic and in policy for drawing the inference that the second confession was the product of the first, and for permitting that inference to be overcome only by such insulation as the advice of counsel or the lapse of a long period of time, cf. United States v. Bayer, 331 U.S. 532, 541, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947); Goldsmith v. United States, 277 F.2d 335, 340–341 (D.C.Cir.), cert. denied, 364 U.S. 863, 81 S.Ct. 106, 5 L.Ed.2d 86 (1960). Gorman's admission to Detective Cuomo was made spontaneously and without pressure, and its causal relation to his subsequent detailed confession is tenuous at best. From a common-sense standpoint the cause of Gorman's detailed confession to Wickman was his having been caught red-handed with the fruits of the Ridgefield robbery, and his awareness, voiced to the federal agents in declining the use of the telephone, that he was "going away for a long time." Under these circumstances sufficient insulation from the prior admission was provided by the warnings to Gorman given by the assistant district attorney and Agent Wick-

man, and the lapse of time between the two statements.[5]

### III.

Roche's principal point on appeal is that $35,000 in currency stolen from the Ridgefield bank and a loaded revolver, found in his luggage on the day after the robbery, were the products of an unlawful search and hence improperly admitted into evidence.

FBI agents Bjorklund and Duffy testified concerning the search: Around 10 A.M. on September 9, the New York office advised Bjorklund at the Garden City, L. I., office that Gorman had been arrested for robbing the Ridgefield bank on the previous day, that he had described a "Mr. DiBartolo" as his partner in the crime, and that check of a motel in Fort Lee, New Jersey, where Gorman had been staying, showed phone calls to Room 504 at the Holiday Inn Motel in Rockville Centre, L. I. The motel's registration card for Room 504 showed a John William Noel of the Connor-Noel Sales Corporation of Houston, Texas—which Bjorklund recognized as the cover mentioned by Gorman to the New York police. Bjorklund, accompanied by Agent Fuss, knocked on the door of the room; Roche, partially dressed and in the course of shaving, opened it, admitted the agents and asked what he could do for them. After allowing Roche to finish shaving, Bjorklund said the FBI thought he might be able to help in the investigation of a bank robbery, but that if he were involved in any way, he needn't say anything and had the right to counsel; Roche replied that he was a businessman and would be happy to help. When asked whether a Robert William Gorman was employed by his company, he professed unfamiliarity with the name and with a description, but suggested the possibility of calling his secretary in Houston. He denied having received any calls from New Jersey but said that a girl who had been staying with him might have done so. Fuss engaged him in discussion of his business, which Roche described as the sale of educational devices to schools; the agent then asked whether Roche had any samples with him and Roche said he did. Agent Duffy, who had meanwhile been admitted to the room, inquired as to a brown attaché case and was told it contained business papers. Bjorklund then asked whether Roche had any objection to the agents looking in his luggage—the attaché case and two suitcases. Roche responded, "Be my guest." Accepting the invitation, Duffy opened the attaché case and found a revolver and several packages of money; Fuss discovered more stolen money in one of the suitcases. When Duffy remarked, "You have been kidding us," Roche responded "What else could I say?"

Our prior discussion makes it clear that if Roche had been lawfully arrested prior to the opening of his luggage, the search would have been valid as incident to a legal arrest. Conceding that he had not been arrested, the Government supports the search as made with his consent. Roche, who did not testify at the hearing on his motion to suppress, points to cases indicating that consent to a search is not to be lightly inferred, United States v. Viale, 312 F.2d 595, 601 (2 Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963); United States v. Como, 340 F.2d 891, 893 (2 Cir. 1965), and argues that since it is incredible he would freely have consented to a search which he knew would disclose incriminating evidence, his words of consent should be consid-

5. Compare cases dealing with the related problem as to the effect of an illegal arrest, Wong Sun v. United States, 371 U.S. 471, 486, 487-488, 491, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Rogers v. United States, 330 F.2d 535, 541-542 (5 Cir.), cert. denied, 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186 (1964); State v. Traub, 150 Conn. 169, 187 A.2d 230 (1962), vacated and remanded for further consideration in light of Wong Sun, 374 U.S. 493, 83 S.Ct. 1899, 10 L.Ed.2d 1048 (1963), adhered to, 151 Conn. 246, 196 A.2d 755 (1963), cert. denied, 377 U.S. 960, 84 S.Ct. 1637, 12 L.Ed.2d 503 (1964); Prescoe v. State, 231 Md. 486, 191 A.2d 226 (1963); State v. Jackson, 43 N.J. 148, 203 A.2d 1 (1964).

ered an involuntary submission to authority and therefore insufficient to waive a constitutional right.[6] Acceptance of this contention would mean that expressions of consent could relieve officers of the need of obtaining a warrant only when the speaker was not aware that the search would disclose damaging evidence[7]—a fact usually not within the officers' knowledge. Such a ruling not only would almost destroy the principle permitting a search on consent but would enable experienced criminals to lay traps for officers who, relying on the words of consent, failed to secure a search warrant that would have been theirs for the asking. Where, as here, no force or deception was either used or threatened, we see no reason why a court should disregard a suspect's expression of consent simply because efficient and lawful investigation and his own attempt to avoid apprehension had produced a situation where he could hardly avoid giving it. Cf. United States v. Dornblut, 261 F.2d 949 (2 Cir. 1958), cert. denied, 360 U. S. 912, 79 S.Ct. 1298, 3 L.Ed.2d 1262 (1959). See also United States v. MacLeod, 207 F.2d 853 (7 Cir. 1953); Honig v. United States, 208 F.2d 916 (8 Cir. 1953); United States v. Smith, 308 F. 2d 657, 663–664 (2 Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L. Ed.2d 716 (1963); United States v. Thompson, 356 F.2d 216, 220 (2 Cir. 1965).

▮ If we were to hold that Roche did not consent, we would be obliged to consider another basis for supporting the search. The argument would be that when a suspect is available for immediate arrest at the place of the search, to which the police have lawfully gained access, and reasonable cause for his arrest exists, a search of personal effects without a warrant is reasonable even though arrest is postponed. The record furnishes the necessary premise. The combination of facts known to the agents—Gorman's admission to having an accomplice, Gorman's and Roche's common use of the Connor-Noel cover, Roche's disclaimer of knowledge of a person in his company answering Gorman's description, and the telephone calls from Gorman to Roche's room in the Holiday Inn—would together have constituted reasonable cause for arresting Roche prior to the search of his luggage; each fact augmented the probative force of the others. Cf. United States v. Monica, 295 F.2d 400, 401–402 (2 Cir. 1961), cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962).

No Supreme Court decision speaks directly to the point. Husty v. United States, 282 U.S. 694, 700, 51 S.Ct. 240, 75 L.Ed. 629 (1931), which would seem to sanction such a search, may rest on special considerations applicable to moving vehicles. Johnson v. United States, 333 U.S. 10, 15–17, 68 S.Ct. 367, 92 L.Ed. 436 (1948), and Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed. 2d 134 (1959), which might appear at first blush to look the other way, are fairly distinguishable—Johnson on the ground that the arresting officer had no "valid basis in law" for his intrusion into the defendant's room, 333 U.S. at 16–17, 68 S.Ct. 367, and Henry on the point that no reasonable grounds existed for the arrest, conceded and held to have occurred when the car was stopped. 361 U.S. at 103, 80 S.Ct. 168. Contrast Rios v. United States, 364 U.S. 253, 262, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960). Indeed, Ker v. State of California, 374 U.S. 23, 43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (opinion of Mr. Justice Clark), indicates the question to be open. We have likewise found no controlling decision in this circuit. Mr. Justice Traynor's well-known opinion in People v. Simon, 45 Cal.2d 645, 648, 290 P.2d 531, 533 (1955), would sustain the validity of

---

6. Since Roche does not dispute that the entry of the FBI agents into his room was with his consent, Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921), is inapplicable.

7. If Roche's trial testimony were to be accepted, this was precisely his situation.

such a search, see also Willson v. Superior Court, 46 Cal.2d 291, 294 P.2d 36 (1956); and Mosco v. United States, 301 F.2d 180, 188 (9 Cir.), cert. denied, 371 U.S. 842, 83 S.Ct. 72, 9 L.Ed.2d 78 (1962), is not to the contrary in the circumstances here presented. Compare United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). Lee v. United States, 98 U.S.App.D.C. 97, 232 F.2d 354 (1956), may be distinguishable, like Johnson, on the basis of unlawful entry by the police, and would not bind us in any event. We do not understand just what values would be served by a rule that would force the police to impose a justifiable restraint on the person as a condition to making a search which, if fruitless, might cause them to decide against it; on the other hand, if the search does lead them to make an arrest for which reasonable cause previously existed, the search would seem "incident to arrest," United States v. Rabinowitz, 339 U.S. 56, 60, 70 S.Ct. 430, 94 L.Ed. 653 (1950), in any normal use of language, and the dilemma of seeking "to justify the arrest by the search and at the same time to justify the search by the arrest," Johnson v. United States, supra, 333 U.S. at 16–17, 68 S.Ct. at 370, is obviously not presented. Since, however, the alternative basis here considered has not been argued by the Government, we rest our decision on what we consider the sufficient ground of consent and leave determination of this issue for another day.

Roche's final complaint is that the Government was allowed to place in evidence Gorman's identification of him as the accomplice. Agent Wickman, in his direct testimony as to Gorman's oral confession, stated without objection that Gorman admitted to having a partner; Wickman said nothing that would have identified Roche as the man. On cross-examination Roche's counsel brought out that Gorman had said the accomplice was Frank DiBartolo and had mentioned no one else. Counsel then asked whether the FBI had located DiBartolo; Wickman replied he believed they had, but was cut off by defense counsel when he en-

deavored to explain there were "certain differences in name." As might have been anticipated, the prosecutor immediately took up the matter on redirect. After some colloquy, Wickman testified that, when Gorman was taken to the FBI headquarters after release from the state authorities, he volunteered that he had just seen his cohort in the office and this was Roche.

The Government, conceding that the hearsay rule would have precluded introducing in Wickman's direct testimony such an identification made after termination of the conspiracy, urges that receipt of the evidence was proper in this case because Roche's counsel had "opened the door," and also because the objection made at the outset of the redirect examination was withdrawn.

■■■ The cross-examination of Wickman was designed to leave the impression that the FBI had indeed located "DiBartolo" and that the latter was still at large; hence, since Gorman had said he had only one partner, Roche could not be the man, and the story that he was simply holding the luggage for Gorman, which he would later tell the jury, must be true. It would make a travesty of a trial if such a tactic could not be parried in the most effective way available—in this case a statement by Gorman that Roche, rather than the fictitious DiBartolo, was indeed his partner. Since the Government could not call Gorman, the parry could be made only by offering a statement by him, if such there was. Roche's counsel doubtless hoped, and gambled, that there was none; Roche is in no position to complain because the gambit failed. See United States v. Apuzzo, 245 F.2d 416 (2 Cir.), cert. denied, 355 U.S. 831, 78 S.Ct. 45, 2 L.Ed.2d 43 (1957); United States v. Mont, 306 F.2d 412, 415–416 (2 Cir.), cert. denied, 371 U.S. 935, 83 S.Ct. 310, 9 L.Ed.2d 272 (1962). It is immaterial that, as was necessarily the case, the hearsay identification of Roche as his partner, elicited on the Government's redirect examination, was made by Gorman some hours later than the statement developed on cross that his

accomplice was DiBartolo. Since the evidence was properly admitted, we need not consider whether the objection was withdrawn or whether, if it were, the case would come under F.R.Crim.P. 52(b).

The Court is indebted to Thomas D. Clifford, Esq., who represented Gorman as assigned counsel, both at the trial and on appeal, for a thorough and effective presentation.

Affirmed.