UNITED STATES of America,
Plaintiff,

v.

Lawrence A. SHAFER et al.,
Defendants.

No. CR 74–165.

United States District Court,
N. D. Ohio, E. D.

March 29, 1974.

Robert Murphy, Paul Lawrence, John Hoyle, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Bernard Stuplinski, C. D. Lambros, Cleveland, Ohio, E. K. Wright, Dover, Ohio, Jack Schulman, Michael Diamant, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

Defendants have moved this court pursuant to Rule 41 F.R.Cr.P. for an order suppressing various statements made by them to members of several law enforcement agencies and investigatory bodies. Such statements were made subsequent to the shooting incident at Kent State University in May of 1970 to agents of the Federal Bureau of Investigation, officers of the Ohio State Highway Patrol, the Portage County Grand Jury, and in the case of defendant McGee, the Federal Grand Jury.

An exhaustive and lengthy evidentiary hearing was held, with all parties to the action presenting testimony and submitting extensive briefs. Testimony was received from all examining officers and officials, from the defendants, themselves, and from other individuals involved in the events at Kent State.

It is not disputed that signed "Waiver of Rights" forms were obtained from seven of the eight defendants by Federal Bureau of Investigation investigatory agents before statements were taken, and Smith, the eighth defendant, admits that he was informed of his rights, and that he nonetheless chose to make a statement. All defendants signed "Waiver of Rights" forms before making statements to the State Highway Patrol officers, and all defendants who made photographic identifications for the Federal Bureau of Investigation agents on May 14, 1970 executed such forms.

All defendants admit being informed of their rights before being questioned by the Portage County Special Grand Jury, and all but defendant Perkins had counsel before testifying there. Defendant McGee had full use of counsel before testifying before the Federal Grand Jury.

Despite this initial appearance of strict conformance with the law, defendants allege three grounds, in general, for invalidating and suppressing all of these statements.

First, they allege that most, if not all, of the "waivers" obtained by investigatory personnel are defective, claiming they were obtained through illegal contemporaneous assurances and false statements by the investigating agents. This argument asserts a unique identity of behavior by all Federal Bureau of Investigation and Highway Patrol agents, every one of whom is alleged to have told all defendants, "they had nothing to worry about," since they were not the targets of the investigation. According to this argument, each and every defendant was given assurances that lawyers were not needed, that his statements would be kept in confidence, and that the waivers were mere "formalities."

Second, defendants assert that each set of statements obtained is "tainted," first, by the written statements made to National Guard officials already held to be inadmissible in evidence in a prior decision of this Court, and second, in the case of the Highway Patrol and Grand Jury statements, additionally by the Federal Bureau of Investigation statements.

Finally, defendants make the unusual contention that, regardless of possible conformity with the requirements of the *Miranda* decision, all of their statements are illegal as the products of coercion. This argument is based on the orders which are alleged to have been given by various superior officers at various times to "cooperate with all investigatory agencies," and to "make statements if requested." Defendants claim that these orders, by themselves, constituted the controlling cause of all of their voluminous statements to each and every agency.

There is no real dispute that some such orders were in fact, given to at least some of the defendants, although the exact time sequence is in doubt. There-

fore, for purposes of this motion, it will be assumed that all of the defendants were so ordered before making any of the disputed statements.

The context for these orders is equally undisputed. From the time when the defendants and other guardsmen came down from the "hill" at Kent State, through the entire period comprehended by these statements, all of the defendants were given repeated assurances, from their commanders and from each other, that they had done nothing wrong. All seem to have been aware of the Ohio "immunity" statute, (ORC § 2923.55), and believed that it afforded them total protection from any possible prosecutions from their actions at Kent State.

It was this conviction, that none of the defendants had anything to fear from those multitudinous investigations—that none of them had done anything "wrong"—that motivated the defendants, as well as all other guardsmen involved in the Kent State incident, to make statements freely and without hesitation, for the most part, to so many different investigators. The atmosphere surrounding these interrogations was not permeated with fear and coercion, but rather reflects a sense of cooperation.

■ While the confidence expressed by the defendants, and fostered by their superiors, may have been mistaken (a matter not yet determined), such "mistake of law", or faulty assumptions as to the likelihood of eventual prosecution, can never constitute coercion, without more.

The initial inquiry then, is to ascertain the admissibility of these subsequent incriminating statements in light of the antecedent Inspector General statements and firing incident reports which have previously been adjudged inadmissible at trial. *See* United States v. Shafer, 384 F.Supp. 480 (N.D. Ohio October 15, 1974). It must therefore be examined whether the efficacy of the warnings given defendants by the law enforcement officers has been vitiated by their alleged misrepresentations as to the purpose and gravity of their investigation. Finally, it is necessary to determine whether the statements in question were the product of an inherently coercive military order. Analysis of some of these areas may necessarily be subsumed in others.

### I. The "Taint" Argument.

The scope of inquiry in such a situation has been stated as follows:

"a court must decide the question of admissibility *ad hoc* based on the particular facts of each case. It has been pointed out that whether a confession to federal authorities, after a proper warning by them, is admissible depends upon the 'causal relationship' between the earlier unconstitutional interrogation by the local police and the later incriminating statements. *See* Evans v. United States, 375 F.2d 355, 361 (8th Cir. 1967). The ultimate issue is whether 'the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation.'" United States v. Knight, 395 F.2d 971, 974 (2nd Cir. 1968) citing Westover v. United States, 384 U.S. 494, 86 S.Ct. 1638, 16 L.Ed.2d 735 (1966).

Thus it is necessary to look to the "totality of the circumstances" so as to determine whether the "causal relationship" between the prior inadmissible Inspector General statements and the various subsequent statements is such as to prove fatal to the latter at trial, Evans v. United States, *supra*.

■ The language of the United States Supreme Court in Westover v. United States, 384 U.S. 494, 86 S.Ct. 1638, 16 L.Ed.2d 735 (1966) may serve as a touchstone. The Court stated therein:

"We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an

accused were taken into custody by the second authority, removed in both time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them." 384 U.S. at 496, 86 S.Ct. at 1639.

In the instant case a minimum of three days elapsed between the taking of the Inspector General statements and the interviewing of the defendants by agents of the Federal Bureau of Investigation. It would appear that both interrogations took place in the same general locality, a gymnasium on the Kent State campus. But it is significant that such a locale is far less conducive to "compelling pressure" than would be a police station or penal institution. The photographic identifications by defendants occurring on May 14, 1970, took place at their respective National Guard Armories and clearly was distinct in time and place from the Inspector General statements.

With regard to the alleged access to, and the use of the Inspector General statements by the Federal Bureau of Investigation (a fact not conclusively proved by the record), it is essential to note that all of the guardsmen present at the time of the incident were interviewed, and not just those who had admitted firing their weapons. It is entirely irrelevant in what order the guardsmen were interviewed. Defendants were not confronted with their respective Inspector General statements, cf. United States v. Small, 297 F.Supp. 582, 586–587 (D.Mass.1969), nor was any explicit or implied reference made to such statements. Thus it would appear that there is no "causal relationship" between the Inspector General statements and the later statements, see Evans v. United States, supra.

Furthermore, since all the guardsmen were interviewed by the Federal Bureau of Investigation, and not merely those who had fired their weapons, the Federal Bureau of Investigation statements were "gained from an independent source," Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920), and any connection between the illegally obtained Inspector General statements and the Federal Bureau of Investigation interviews is "so attenuated as to dissipate the taint," Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Such statements have not "been come at by exploitation of that illegality" but rather "by means sufficiently distinguishable to be purged of [that] primary taint," Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The court's reasoning in this respect is reinforced by the recent decision of Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). There the Court held admissible the "fruits" of police conduct where there was a departure "only from the prophylactic standards later laid down by [that] Court in Miranda," 42 U.S.L.W. at 4890. This decision is not deemed to be controlling in this case but instead provides guidance the effect of which is cumulative.

## II. The "Warnings" Argument.

█ Defendants further seek suppression of the subject statements on the ground that the Miranda warnings rendered by the law enforcement officers were initiated by alleged misrepresentations as to the scope of their investigation. Even if such representations were made (a question marked by directly conflicting testimony),

> "the 'compelling pressures' which concerned the Supreme Court in Miranda were absent. (citation omitted). Therefore, unlike the situation in Westover, the careful giving of the warnings alone was sufficient to protect the [constitutional] privilege" (citation omitted). United States v. Knight, 395 F.2d 971, 975 (2nd Cir. 1968).

There are few more sobering experiences than being asked to read and execute a waiver of one's constitutional rights

prior to questioning by agents of the Federal Bureau of Investigation. To argue that the defendants gave so much weight to the oral remarks of the agents so as to overcome the plain and unmistakable meaning of the waiver requires convoluted reasoning.

In addition, the identical assertions of all eight defendants that each of the several interviewing Federal Bureau of Investigation agents and Highway Patrolmen made the same "assurances" to each defendant are unconvincing. The very volume of defendants' testimony undermines its credibility.

■ Rather than attempting to "mislead" or "trick" defendants during their interrogations, it seems probable, based on all of the testimony, that the investigating officers merely availed themselves of defendants' prior conviction that no guardsmen would ever be prosecuted for his actions at Kent State. Law enforcement agents are obliged only to warn subjects of questioning of their rights, and not to disabuse them of their possible misconceptions.

No misconduct by the investigating Federal Bureau of Investigation agents and Highway Patrol officers which would "vitiate" the adequate warnings admittedly given to all defendants is apparent.

III. *The "Coercion" Argument.*

■ As a final ground for suppression the defendants argue that the subsequent statements and testimony were the product of the coercion inherent in an order to "cooperate with all investigating agencies" and "to make statements if requested." This reasoning fails for several reasons.

First, the confident atmosphere that pervaded the entire National Guard organization after the shooting incident, although the product of either wishful thinking or misjudgment by Guard officials, militates against any such coercive force. It is abundantly clear that the statements sought to be suppressed found their genesis in, and were

nurtured by the defendants' false sense of security. This attitude was engendered by their misplaced reliance on the Ohio immunity statute.

Secondly, the coercive force found in a military order may well not be sufficient to warrant suppression of the statements made after the taking of the Inspector General statements. As was stated in United States v. Bayer, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947):

"Certainly such a limitation on the freedom of one in the Army and subject to military discipline is not enough to make a confession voluntarily given after fair warning invalid as evidence against him." 331 U.S. at 541, 67 S.Ct. at 1398.

Finally, assuming *arguendo* that the coercion alleged by defendants did in fact exist, such coercion would not require suppression of the subject statements. Distilling defendants' coercion argument to its essential elements, all that is left is an order to cooperate with various investigations coupled with an order to make a statement if requested. Construed most stringently, these orders constitute nothing more than "custodial interrogation." *See* United States v. Tempia, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967); United States v. Fisher, 21 U.S.C.M.A. 223, 44 C.M.R. 277 (1972). For a statement made in such circumstances to be admissible it need only be cloaked in "procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 431, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The *"Miranda* Warnings" such as were uniformly given to defendants in the instant case fully satisfy the requirements of such procedural safeguards.

■■ An additional comment is required with regard to the defendants' testimony before the Portage County Grand Jury and defendant McGee's testimony before the Federal Grand Jury. All of the defendants were warned of their constitutional rights prior to

such testimony, and all but defendant Perkins had advice of counsel. The presence of counsel presents a significant obstacle to any argument for suppression of such testimony, no matter what other circumstances are asserted. In United States v. Gorman, 355 F.2d 151 (2nd Cir. 1965), the court stated that a strong basis for holding a second confession inadmissible would be overcome "only by such insulation as the advice of counsel or the lapse of a long period of time." 355 F.2d at 157. With regard to defendants' Grand Jury testimony, both such insulating factors were present. Thus, such testimony is clearly admissible at trial.

The above constitute the court's findings of fact and conclusions of law.

It is so ordered.