UNITED STATES of America

v.

Guy Leroy SCHULTZ, III.

Crim. No. K–76–0647.

United States District Court,
D. Maryland.

Aug. 31, 1977.

Jervis S. Finney, U. S. Atty., and Robert P. Trout, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Charles G. Bernstein, Federal Public Defender, and Gerald M. Richman, Asst. Federal Public Defender, Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

Defendant was charged in a two-count indictment with unlawfully making a firearm in violation of 26 U.S.C. § 5822, and for knowingly possessing an unregistered firearm in violation of 26 U.S.C. § 5861(d). The weapon which is the subject of both counts is a sawed-off shotgun. The defendant in a pretrial motion has moved to suppress that weapon as well as certain statements allegedly made by defendant with regard to it. This Court, after an evidentiary hearing, makes the following findings of facts.

### Facts

The testimony of Private Frank L. Logan of the Prince George's County Police Department can be summarized as follows:

On August 20, 1976, at approximately 3:10 a. m., Logan was on routine patrol in Prince George's County when he first viewed defendant's car travelling north on Old Branch Avenue, a two-lane highway with street lights, in a "sparsely residential" area (Tr. 9). There was virtually no other traffic on the road. Within a few minutes, Officer Logan again saw defendant's car, this time travelling south on Old Branch Avenue. Logan, driving a police car marked as such, followed defendant's car for approximately one mile, observing that defendant's car swerved "several times, not very distinctly but it did penetrate the yellow line." (Tr. 8). When defendant reached Bradley Road, a road running west of Old Branch Avenue and perpendicular to it, defendant stopped his car for approximately ten seconds in the middle of the right-hand lane on Old Branch in which defendant was proceeding, despite the absence of any traffic control device at that spot. Officer Logan came to a stop, or almost to a stop, directly behind the defendant, but did not turn on his rotating red and blue lights or his siren. Defendant then turned right into Bradley whereupon Logan turned on his rotating lights and pulled defendant over to the side of Bradley.

Defendant immediately exited from his car, approached Officer Logan's car and remarked, "I didn't know you were a police officer, the reason I stopped is because I thought you were too close to me." Logan smelled a "faint" odor of alcohol on defendant's breath. (Tr. 18). After Logan asked defendant for his registration card and license, the two walked to defendant's car to obtain them. Logan then detected a faint odor of marijuana smoke emanating from defendant's vehicle. (Tr. 18–19).

Upon returning to the marked police vehicle, Logan questioned defendant as to his drinking. Defendant responded that he "had a couple beers" (Tr. 20). Logan then asked if defendant had smoked marijuana and defendant responded in the affirmative, indicating "he had had a joint." (Tr. 20–21). Defendant stated that because he had had an argument with his mother, he had gone out that evening, had had a couple of beers, and had smoked a joint.

Logan continued to question defendant with regard to whether there were any additional alcoholic beverages or marijuana in defendant's vehicle. Defendant responded in the negative. (Tr. 21). Logan then asked whether he could search defendant's vehicle. Defendant responded "he would rather I [Logan] did not." (Tr. 21). Logan then told defendant that, "due to his condition and his confession as to partaking of alcohol," Logan could arrest defendant. (Tr. 21). Defendant replied that he would like to call his mother. That request was denied. (Tr. 22). Defendant was challenged by Logan to prove that there was no additional beer or marijuana in the car. Defendant continued to respond in the negative, appearing nervous and upset. (Tr. 22). Logan inquired with regard to why defendant did not want the vehicle to be searched. At that point, defendant replied: "All right, I have a sawed-off shotgun in the car." (Tr. 22–23). Logan then advised defendant of his rights using a card (Government's Exh. 1) provided by the Prince George's County police. (Tr. 23). Logan read to defendant every word on the front of that card (Tr. 25), but did not read to defendant the "waiver side" of the card. (Tr. 26).

After defendant acknowledged that he understood his rights (Tr. 28), Logan and defendant went to defendant's car. Logan placed defendant in front of defendant's car, opened the driver's door and seized the shotgun. (Tr. 28). Logan and defendant then returned to the police car where Logan questioned defendant as to his reasons for possessing a shotgun. (Tr. 29–30). Defendant, in response to Logan's questions, fabricated a story to the effect that he had been involved in a drug transaction and had paid a substantial sum of money to a person named by defendant, purportedly in exchange for two pounds of marijuana which were never delivered to defendant. Defendant stated that he had intended to use the gun to scare that person into either returning defendant's money or delivering the marijuana. (Tr. 29–31). Subsequently, Logan and defendant entered into an agreement pursuant to which defendant agreed to have the weapon confiscated and further to cooperate with the vice-intelligence section of the Prince George's County Police Department in apprehending the person who allegedly had sold the drugs to defendant, and was released by Logan and permitted to return to his home. (Tr. 32).

During the morning of the day of the incident, Logan filed a police report with the notation—"suspect checked out okay, released after information pertaining to above property given to officer, suspect requested weapon to be destroyed." (Tr. 52). Logan testified that the words, "suspect checked out okay," mean that there were no problems uncovered by investigation or voiced by Logan's superiors with regard to defendant's license, registration, apparent intoxication and Logan's decision to release defendant. (Tr. 52–53). When asked during the evidentiary hearing in this Court what he would have done if defendant had continued, without explanation, to refuse to consent to a search of defendant's vehicle, Logan replied: "I probably would have placed him under arrest for operating either in an intoxicated condition and towed his vehicle." (Tr. 72).

After defendant, during the next several weeks, failed to cooperate with the police as promised, defendant was arrested on September 13, 1976. (Tr. 33–34).

While defendant's testimony supports Logan's in most respects, there are some inconsistencies. Defendant's testimony, insofar as it differs from Logan's testimony, can be summarized as follows:

Defendant first noticed Logan's police car following him while defendant was driving south on Old Branch Avenue. The police car was following so closely that at one point defendant could not see the police car's headlights in defendant's rear-view mirror. (Tr. 85–86 and 101). Defendant denied making a statement to Logan that defendant did not know the police were following defendant. In addition, defendant claimed that after Logan checked defendant's license and registration, defendant was told to return to his vehicle and to leave the scene. (Tr. 88–90). However, at this point, Logan followed defendant to his car and smelled marijuana. (Tr. 90). Defendant then related that he was pressured into allowing a search of his vehicle and interrogated as to the reasons for his negative responses (Tr. 91–92), and that Logan told him he could "have me taken in," "have my car impounded," "have me arrested," and "have my car searched and itemized." Defendant testified that he thereupon, after a pause in the conversation, responded: "let me level with you, there's a sawed-off shotgun in my car." (Tr. 92).

Defendant testified that Logan never during the August incident advised him of his *Miranda* rights, and that defendant was first so advised by an agent of the Bureau of Alcohol, Tobacco and Firearms (ATF) after the defendant was subsequently arrested and charged in September. This Court finds beyond a reasonable doubt that Logan did advise defendant during the early A. M. of August 20th of his rights in the manner in which Logan testified. To the extent the testimony of the two men otherwise conflicts, the Court accepts defendant's recollection as more detailed and more reliable than that of Logan, even though this Court has no question that Logan's testimony was truthful and candid.

On September 13, 1976, after Logan arrested defendant following defendant's failure to cooperate, defendant was questioned by ATF agents Ellison and Townsend at Clinton Substation, Maryland. On that date, prior to turning defendant over to those agents for interrogation, Logan himself questioned defendant with regard to why defendant had refused to cooperate in the planned drug operations, but did not further ask defendant about the gun. Also before those two agents questioned defendant on September 13, 1976, Logan advised Townsend of the information known to Logan from Logan's prior investigation and informed Townsend that, after he [Logan] had advised defendant of his rights on August 20th, defendant had given to him [Logan] "an oral statement * * * which in substance was as follows:"

> Schultz stated that he had sawed off the barrel of the shotgun so that he could try to regain $240.00 which he had given a drug dealer to buy some marijuana; however, the dealer never delivered the marijuana. Therefore he was going to use the sawed-off shotgun in an attempt to get his money back. [7/1/77 Townsend Affidavit, p. 2, ¶ 4.]

During the ensuing interview of defendant by the ATF agents on September 13, 1976, Logan was present for at least part of the interview, but to the best of Agent Townsend's recollection, "did not participate in the interview and did not suggest any questions." (7/1/77 Townsend Affidavit, p. 2, ¶ 5.) During that interview, defendant admitted his possession of the gun on August 20, 1976. Before that interview began, defendant was advised by Agent Ellison of his *Miranda* rights and knowingly and understandingly signed a waiver form. There is no reason to exclude defendant's September 13, 1976 statement unless it is fatally tainted by his earlier August 20, 1976 statement. That is one of the legal issues discussed *infra.*

### Legal Issues

Defendant claims that his oral and written statements on August 20th and September 13th were not voluntary and also attacks the warrantless search of his car and the seizure of the gun.

■ The Government contends that the questioning of defendant by Logan on August 20th was not a "custodial interrogation." That contention is rejected. Logan questioned defendant in the police car. Defendant specifically asked to be allowed to talk with his mother. Logan denied that request. Logan asked defendant whether defendant had been drinking and whether defendant had been smoking marijuana. Defendant replied in the affirmative. Logan's further inquiries were directed at whether there were additional quantities of alcohol or marijuana in defendant's car. Defendant's refusals to allow Logan to search the car in order to confirm or contradict defendant's statements were countered by Logan's assertions that failure to consent would result in arrest and in impoundment and inventorying of the car.

The atmosphere was coercive in nature. Nothing in *United States v. Harris,* 528 F.2d 914 (4th Cir. 1975), teaches to the contrary. In that case, after finding that a brief pre-arrest conversation between ATF agents and defendant was not custodial interrogation, Chief Judge Haynsworth, in an alternative holding, after discussing *United States v. Gibson,* 392 F.2d 373 (4th Cir. 1968), wrote (at 915) that "[t]he agents exercised no control over Harris other than approaching him, while in *Gibson* the officer had asked him to step outside. Both encounters were quite brief. Under the circumstances of this case, we think that there was no 'potentiality for compulsion' or other consideration to bring *Miranda* into play."

In *Gibson,* the police officer had received an anonymous tip that "a 1965 white Chevrolet Impala," being driven by defendant, and bearing Indiana license plates 73C826, was believed by the informant to have been stolen. The officer contacted the Indiana authorities and was told that the plates were registered to someone other than the defendant and had recently been reported " 'lost or stolen.' " 392 F.2d *supra* at 374.

The car was located in front of a bar. The officer entered the bar, asked defendant to step outside and, on the sidewalk in front of the bar, questioned him. Defendant, after first denying ownership of the car, changed his story, claimed ownership and presented a registration slip which appeared to the officer to have been altered. The officer then arrested defendant for drunkenness, and after arresting him, advised defendant for the first time of his *Miranda* rights. Subsequent investigation revealed that the car had been reported stolen in Cleveland, Ohio. Judge Soboleff held defendant's statements admissible, concluding that the sidewalk questioning was not custodial in nature and wrote (at 375–76):

> In *Miranda,* the primary concern of the Court was with the "potentiality of compulsion" inherent in in-custody interrogations. The Court spoke of that case as one in which "[a]n individual is swept from [his] surroundings into police custody," "thrust into an unfamiliar atmosphere," held incommunicado, "surrounded by antagonistic forces," and "run through menacing police interrogation procedure." This is not such a case.
>
> "Custodial interrogation" certainly includes all station-house or police-car questioning initiated by the police, for there the "potentiality for compulsion" is obvious. Whether it also reaches police inquiries made of a suspect on the street or at his own home was left unanswered by the Court and has been much debated. * * * Precise refinements of the terms "custody" and "interrogation" will have to be developed on a case-by-case basis. Thus, our present task is to determine whether the atmosphere surrounding the brief police questioning on the sidewalk near the car was characterized by "official overbearing" or "overzealous police practices" which, as the Court pointed out, could preclude the individual's making a rational decision whether to speak to the police or remain silent.
>
> This court does not read *Miranda* as requiring officers to preface with a warning all non-coercive questioning conducted in the course of a routine investigation

as in the circumstances of this case. See *Allen v. United States,* 390 F.2d 476 (D.C. Cir. 1/25/68). Not until the suspect has been taken into custody or restrained in a significant way do the *Miranda* requirements attach. [Footnotes omitted.]

In *Clay v. Riddle,* 541 F.2d 456 (4th Cir. 1976), a habeas corpus case, Judge Bryan held *Miranda* inapplicable to a statement which arose, after questioning by a police officer, "in the environs of the unlawful highway operation of an automobile * * *."

In *Clay,* the police officer learned for the first time of the petitioner's status as a recidivist after that officer had obtained the statement. It was that status which made possible the petitioner's Virginia felony conviction as a habitual offender against that State's highway laws. Judge Bryan concluded that the circumstances in which the statement was made "mold its [the statement's] character permanently." 541 F.2d *supra* at 459. Dissenting, Judge Butzner argued that the interrogation was conducted after the defendant "was held at gun point, disarmed, and handcuffed" and after he had been "taken into custody for interrogation about the traffic offense" (at 459). Judge Bryan did not reach the issue of whether *Miranda* is inapplicable to misdemeanors in general and did not rely upon certain state court cases which have so held. Judge Butzner, however, stated (at 460) the view that "the need for giving the *Miranda* warnings should be determined by the nature of the interrogation, not by the nature of the offense," and seemingly rejected nonapplication of *Miranda* because of "the triviality of the offense."

In the case at bar, when Logan smelled marijuana smoke and defendant confessed to having "smoked a joint," the case became more than a mere traffic stop. Md.Ann.Code art. 27, §§ 279(a)(3)(c)(7) and 287(a) and (e) makes possession of marijuana a misdemeanor punishable by up to one year's imprisonment or a $1,000 fine or both. Logan's questions were designed to inquire into possible crime unrelated to traffic offenses. Indeed Logan specifically

inquired whether defendant had more marijuana in the car. Possession of that substance, "in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense," is a felony punishable by up to five years' imprisonment and/or a $15,000 fine. Md. Ann.Code, § 286(a)(1) and (b)(2) (1976 Repl. Vol.). Once Logan went beyond the "mold" of the traffic offense, *Miranda* was applicable even if *Miranda* is inapplicable when only a misdemeanor is involved, a proposition which Judge Bryan in *Clay* did not espouse and which this Court, in agreement with Judge Butzner's reasoning in his dissent in *Clay*, is free to and does reject, absent any direction to the contrary from the Supreme Court or the Fourth Circuit.

Under all of the factual circumstances in this case, defendant's August 20, 1976 statement that he had a gun in the car is inadmissible under *Miranda*. That, however, does not mean that the gun seized on that date or the September 13, 1976 statement should also be suppressed. Before defendant confessed to possession of the gun, Logan had probable cause to arrest defendant in view of the alcohol on defendant's breath and the odor of marijuana smoke emanating from defendant's car, particularly in the light of the fact that it was an unusual time for defendant to be out driving, and in the light of the defendant's "coming and going" without apparent purpose, the somewhat erratic weaving in defendant's driving pattern, and defendant's stopping on the road. Those facts establish probable cause to believe that marijuana was in the car. That means that a misdemeanor, if not a felony, was committed in Logan's presence. Thus, Logan could have executed a warrantless search of the car incident to the arrest. Alternatively, Logan could have at the very least impounded the car and had it searched at the police station. *See United States v.*

*Colclough,* 549 F.2d 937, 940 (4th Cir. 1977), and cases cited thereat. Had Logan proceeded in either such manner, he, or other officers at the station, would have found the gun in the car, whether or not defendant had made a prior statement about it. In *United States v. Harris, supra* at 914, ATF agents, while responding to a reliable tip that defendant in that case was in an alley with a gun in his pocket, approached that defendant with the intention of arresting him. The agents asked whether the defendant had a gun, even though they could observe the gun protruding from his pocket. Defendant replied that he did and began to withdraw it. The agents immediately arrested defendant, seized the gun, and then gave Harris his *Miranda* warnings. The District Court suppressed the gun and the statement. Reversing, Chief Judge Haynsworth wrote (at 915):

> The district court granted the motion to suppress on the ground that the pistol was obtained as a result of police questioning in violation of *Miranda v. Arizona,* 384 U.S. 436, [86 S.Ct. 1602, 16 L.Ed.2d 694] * * * (1966). The court laid great stress on the agent's statement that he was going to arrest Harris after his observations, but before the question. Even assuming that the question was improper, however, the weapon should not have been suppressed. It was in no way a product of a *Miranda* violation; the agents knew as much about the pistol before the question as after it. In this case it is undisputed that the agents could have walked directly up to Harris, detained him, and frisked him. The product of such a search would have been admissible. The circumstance that they politely asked about the pistol, instead of forcibly seizing it, makes it no less admissible.[1]

1. In *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), Mr. Justice Brennan stated:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).

The fact that in this case Logan engaged in what this Court holds to have been custodial interrogation does not erase Logan's preexisting right to search the car. Nor does the fact that the interrogation in violation of *Miranda* revealed to Logan the nature of the contraband before he searched the car, whereas otherwise Logan would only have had the right to search for marijuana and would have had to come upon the gun unexpectedly, require suppression. The fact remains that, assuming Logan had not questioned defendant at all after smelling the marijuana, the gun inevitably would have turned up if Logan had proceeded to search the car as he lawfully could have. Thus, it cannot be said that, but for the *Miranda* violations, the evidence of the gun would not have been discovered. Accordingly, in this case, the earlier failure of Logan to give defendant his *Miranda* warnings and the suppression of defendant's August 20, 1976 statement do not require suppression of evidence relating to seizure of the gun.

■ The further question arises as to whether defendant's September 13, 1976 statement is tainted by anything that occurred on August 20, 1976. There are circumstances under which an earlier statement can taint a later one. Thus, in *United States v. Bayer,* 331 U.S. 532, 540–41, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1947), Mr. Justice Jackson wrote:

> Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in

---

*See also United States v. Cole,* 463 F.2d 163, 173 (2d Cir.), *cert. denied,* 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972), in which Judge Friendly wrote: "Conduct is not a legal cause of an event if the event would have occurred without it. Prosser, Torts § 41 at 239 (1971 ed.)."

*See also Government of Virgin Islands v. Gereau,* 502 F.2d 914 (3d Cir. 1974), in which Chief Judge Seitz reviewed the evidence and concluded (at 927–28):

> Defendants argue that even if we sustain admission of the items taken in searches of 160 Estate Grove Place, we must find that the district court erred in refusing to suppress a luger found nearby. The luger, which tests determined was used in the Fountain Valley killings, was found on September 9, 1972, on a rooftop near 160 Estate Grove Place after Smith had given a statement admitting that he had thrown a gun out of the rear window of 160 Estate Grove Place at the time of his arrest. Smith's statement was suppressed because it was given following his indication of a desire to have an attorney present, and defendants contend the luger should be suppressed as the product of this statement. To sustain admission of the luger, the Government must prove, by clear and convincing evidence, that the evidence was not found as a result of Smith's improperly obtained statement. *United States v. Archie, supra,* 452 F.2d [897] at 898; see *Alderman v. United States,* 394 U.S. 165, 183 [89 S.Ct. 961, 22 L.Ed.2d 176], * * * (1969); *United States v. Falley,* 489 F.2d 33, 41 (2d Cir. 1973). The Government seeks to meet its burden not by refuting the claim that Smith's statement hastened location of the luger, but by showing that police and F.B.I. agents would have found the luger even without Smith's statement. Several officers testified that, shortly after police called to Smith to come out from 160 Estate Grove Place, a window in the rear of the house opened, a noise was heard that might have been metal or stone striking a rooftop, the window shut and, a few moments later, Smith exited through a front window. Throughout the week following the Fountain Valley killings a very large number of police officers and F.B.I. agents were engaged in a massive effort to find the killers and the weapons used by them. The autopsy and ballistics reports identified five murder weapons, one of which was the luger. The District Judge found that, in light of the observations of the police officers, the nature of the "saturation" search being conducted, the location of the luger (which, while out of sight, was neither concealed so as to make detection exceedingly difficult nor deposited in a location far removed from any place police had reason to search), and its identification as a murder weapon, the police and F.B.I. agents would have found the luger without utilization of Smith's statement. We cannot say this finding is clearly erroneous and conclude that it satisfies the Government's burden to show that the luger was not the "fruit of the poisonous tree." See *Wong Sun v. United States, supra,* 371 U.S. at 487–488, 83 S.Ct. 407, * * *; *United States v. Falley, supra,* 489 F.2d at 40–41; *Killough v. United States,* 119 U.S.App.D.C. 10, 15, 336 F.2d 929, 934 (1969). Suppression of the luger, thus, was properly denied.

the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed. * * *

In *Knott v. Howard,* 511 F.2d 1060, 1061 (1975) (per curiam), the Fourth Circuit, in a habeas corpus case in which pre-*Miranda* standards were held applicable, stated:

There is, of course, no general rule that if an inadmissible confession is received, no subsequent confession can be admissible. *See United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654, * * * (1947). The appropriate inquiry then becomes whether the conditions that rendered the earlier confessions inadmissible carried over to invalidate the subsequent one. * * *

*Accord, United States v. Toral,* 536 F.2d 893, 896 (9th Cir. 1976); *See Lyons v. Oklahoma,* 322 U.S. 596, 601–04, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944); *Myers v. Frye,* 401 F.2d 18, 21–22 (7th Cir. 1968). In making that inquiry,

the facts and circumstances must be examined on an ad hoc basis to determine the existence of, and extent of, a causal relationship between on the one hand the earlier, unconstitutional conduct (and the statement which is a product thereof if a statement was made) and on the other hand the statement made later. [Footnote omitted.]

*Harney v. United States,* 407 F.2d 586, 589 (5th Cir. 1969), citing and relying upon *Westover v. United States,* 384 U.S. 436, 494–97, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *accord, Evans v. United States,* 375 F.2d 355, 360–61 (8th Cir. 1967), *rev'd on other grounds sub nom. Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Cf. Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

In this case, more than three weeks,[2] during which defendant was not in custody,[3] elapsed between August 20th and September 13th. On that latter date, the ATF agents took defendant's statement at a place physically removed from the site of Logan's initial August 20, 1976 questioning.[4] Although Logan was present during the September 13, 1976 interview, or at least part of it, and the ATF agents had the benefit of certain information from Logan, including defendant's August 20th statement to Logan about the gun, there is absent the kind of collaboration between federal and state law enforcement officials which has been deemed controlling in the finding of taint in other cases.[5] Moreover, approaching, as Judge Friendly suggests in *United States v. Gorman,* 355 F.2d 151, 157 (2d Cir. 1965), the issue from a common

2.  *Compare United States v. Bayer,* 331 U.S. *supra* at 541, 67 S.Ct. 1394 (second statement held admissible after six months delay); *Lyons v. Oklahoma,* 322 U.S. *supra* at 604, 64 S.Ct. 1208, (second statement admissible after "full twelve hours" delay); *United States v. Thor,* 512 F.2d 811, 813 (5th Cir. 1975) (second statement held admissible after "a few weeks" delay); *United States v. Hale,* 397 F.2d 427, 429 (7th Cir. 1968) (second statement held admissible after one day delay where lengthy consultation with counsel intervened); *Evans v. United States,* 375 F.2d *supra* at 360 (three day delay seen as potentially long enough to remove taint, although other factors required suppression); *United States v. Gorman,* 355 F.2d 151, 155, 157–58 (2d Cir. 1965) (second statement admissible after nine hours delay), *with Randall v. Estelle,* 492 F.2d 118, 120 (5th Cir. 1974) (second statement inadmissible after two hours delay); *Harney v. United States,* 406 F.2d *su-*

*pra* at 588 (second statement inadmissible after three to seven hour delay); *Myers v. Frye,* 401 F.2d 18 (7th Cir. 1968) (further evidentiary hearing held required where second statement made after less than one day delay).

3.  *See Wong Sun v. United States,* 371 U.S. *supra* at 491, 83 S.Ct. 407; *United States v. Hale,* 397 F.2d *supra* at 429; *Evans v. United States,* 375 F.2d *supra* at 360.

4.  *See Westover v. United States,* 384 U.S. *supra* at 496, 86 S.Ct. 1602; *Knott v. Howard,* 511 F.2d *supra* at 1061.

5.  *See Westover v. United States, supra* at 496–97, 86 S.Ct. 1602; *Harney v. United States,* 407 F.2d *supra* at 590; *Evans v. United States,* 375 F.2d *supra* at 360–61; *cf. United States v. Thor,* 512 F.2d *supra* at 814 (no taint held to exist).

sense viewpoint, the cause of defendant's second confession was the seizure of the gun by Logan and defendant's subsequent unwillingness or inability to cooperate with the police in connection with possible offenses. To put it another way, defendant seemingly would have made his September 13, 1976 statement, whether or not he had made his earlier statement to Logan on August 20, 1976, because the defendant's gun had been found in his car. Thus, since the search and seizure of that weapon is herein held valid, the September 13, 1976 statement should not be suppressed. That is particularly so in a case in which the circumstances surrounding the wording of the initial August 20th statement, while themselves violative of *Miranda* standards, were not so egregiously inappropriate in intensity as to linger on as a substantial coercive cause of the second statement made on September 13th after a significant period of delay.[6]

### Conclusion

Defendant's motion to suppress will be granted with regard to his statement to Logan on August 20, 1976, and denied with regard to the seizure of the gun on that date and defendant's subsequent statement on September 13, 1976.

---

6. *See United States v. Toral,* 536 F.2d *supra* at 896; *Knott v. Howard, 511 F.2d supra* at 1061.