**Jack D. STOVALL, and all those in similar situations, Plaintiffs,**

**v.**

**Larry BENNETT, Commissioner, etc., et al., Defendants.**

**Civ. A. No. 78–427–N.**

United States District Court, M. D. Alabama, N. D.

May 29, 1979.

---

Jack D. Stovall, pro se.

Charles A. Graddick, Atty. Gen., and Willis E. Isaac, Asst. Atty. Gen., State of Alabama, Montgomery, for defendants.

### MEMORANDUM

JOHNSON, Chief Judge.

Plaintiff Jack David Stovall is an inmate at Fountain Correctional Center ("Fountain") in Atmore, Alabama. On behalf of ,approximately 101 other inmates who, in October, 1978, signed a petition requesting Mormon religious services in the prison, plaintiff brings this action alleging that their First Amendment rights to free speech and the free exercise of their religious beliefs have been violated. This action is brought pursuant to 42 U.S.C. § 1983; the jurisdiction of the Court is invoked under 28 U.S.C. § 1343. Named as defendants are Larry Bennett, Commissioner of the Alabama Board of Corrections; J. O. Davis, Warden of Fountain; and Martin Weber, Chaplain at Fountain.[1] The complaint alleges that defendants are guilty of two constitutional wrongs: (1) that in violation of the free exercise clause, they have denied plaintiffs the right to hold regular Mormon religious services, and (2) that in violation of the assembly and petition clause, they have threatened and imposed punishment for signing petitions requesting Mormon religious services. Plaintiffs seek declaratory and injunctive relief. From defendants Bennett and Davis, they seek nominal damages. From defendant Weber, plaintiffs seek compensatory and punitive damages in a total amount of $1,000,000. The case is now submitted upon the depositions of plaintiff Stovall; defendants Davis and Weber; inmates James Dillard, Douglas Chappel, and James McMurtrey; and Charles Blackledge, classification specialist at Fountain.

1. Since this suit was filed, Larry Bennett has been replaced as Commissioner by Robert Britton, who is a defendant in his official capacity by the operation of Rule 25(d)(1).

At the outset, the Court finds that this suit is maintainable as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. Plaintiff Stovall represents the class of all inmates at Fountain who wish to worship as Mormons. This class, which numbered slightly over one hundred before the alleged acts of intimidation and harassment took place, is sufficiently numerous that joinder of all members is impracticable. The Court finds that the central questions of law and fact are common to the class; that the claim of plaintiff Stovall is typical of the claims of the class; and that plaintiff Stovall adequately represents the interests of the class. The Court finds further that the defendants have acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole.

The evidence reflects that there is a varied religious program available to prisoners at Fountain. At the time of the events giving rise to this lawsuit, Baptist, Methodist, Presbyterian, Church of God, Holiness, Assembly of God, Pentecostal, Jehovah's Witness, Free Will Baptist, Catholic, and Muslim services were being held regularly in the prison chapel. Responsible for supervising the overall religious program was Martin Weber, who, as chaplain at Fountain, was a paid employee of the Alabama Board of Corrections. On October 25, 1978, plaintiff Stovall approached Weber and informed him that over one hundred inmates wished to attend Mormon services. Unaware from the prison records that there were any Mormons at Fountain, Weber expressed skepticism about Stovall's claimed support and demanded that Stovall provide him a list of names of those supporting his request.

Contributing to Weber's skepticism was a certain hostility toward those who wanted to introduce a new religion into the curricula of the prison ministry. In his affidavit, Weber characterized the Mormon inmates as prisoners who wanted a "white man's religion, like the Muslim is a black man's religion." He indicated that inmates had told him that "this new religion would allow them to wear beards, mustaches, and a special diet line, etc." There is no evidence that such demands were made at that time or at any later time. In his deposition, taken after he had learned that his warning to the Mormon inmates had been taped,[2] Weber expressed not the slightest reservation about the motives of plaintiffs in requesting Mormon services. The obvious change in tone between Weber's affidavit and deposition lends credibility to Stovall's assertion that on prior occasions the chaplain had disapproved of Mormon services because "the Mormon Faith was not a true religion."

On the same day as the chaplain's request, Stovall gave him a typed list of 102 names. Stovall asserts that, on seeing the names, Weber noted that a number of the inmates in his congregation were on it, and he remarked that "the Warden isn't going to like this." Weber then proceeded to the warden's office with the list in hand. At their meeting on October 25, however, Warden Davis authorized Weber to arrange for monthly Mormon services immediately.

The following evening in chapel, after a hymn had been sung and before the guest minister had been introduced, Weber made the following comments, which were taped:

> I want to make an announcement tonight. I'm a bit reluctant to make it for thinking that someone's going to take the wrong meaning from it . . . . [Y]esterday I received a paper with 102 names on it—that you'd like to have another group in, which all you would have had to do is ask me. I can get them in and will be doing that . . . . It's not hurting me, it's hurting you. Your name's going on that piece of paper is in the warden's office, in other words, there's a photostatic copy there. And of course if you don't know the warden, you better learn to know him—because any man that signs his name to something is a sign of bucking, or is saying I'm not

---

2. Transcribed below at p. 1288.

satisfied—I want this and I want that. Well, he'll say, his term is, well that man's still got some wind in him so he just: IGT time, down the drain; progress report, down the drain; you just simply wait . . . . Sign your name as much as you want to if you don't want to make progress. But if you want to make progress, you going to be smart, you going to come and talk to people rather than put your name on a piece of paper, because that goes right up to the office and he made a photostatic copy of it and it's in his office and he said, "they'll need me before I need them." You can read through that. So I'm just saying that for your benefit. Understand, I don't care how many places you sign your name on. I don't even care if you sign a writ against me—I don't care—'cause I'm going to do what I feel is right and I'm ready to stand before any federal judge. I don't care who he is . . . . You're not hurting me; you're hurting yourself when you sign your name to some type of petition or try to say "we want this, we want that." Instead of what you could have done is come straight either to warden, to me or someone else and talked it over—that would save yourself if you face it that way . . . . I don't care what you do. If you want to stay here, that's a good way to make reservations to stay longer . . . . I repeat, I care about you; I want to see you make progress; I don't want to see you go backwards. Those are kinds of things that will hurt a man. So think about it before you sign again. If you got a problem, see your counselor, see the warden, see your lieutenant, see me or see somebody else if you got a problem. But don't sign your name to something if you want to get free, if you want to get IGT time, . . . if you want to get your custody changed, these kinds of things, 'cause that will hurt you. So, okay, so much for that.

After the service, various inmates reported the chaplain's comments to Stovall, who drafted a letter to the warden complaining that Weber had threatened the inmates seeking Mormon services. The next morning, Stovall talked to the warden, who disavowed the alleged threats and said he would speak to the chaplain and have him get in touch with Stovall. Later that morning, Warden Davis instructed Weber to clear up the misunderstanding. To Stovall, the chaplain denied that he had made any threats.

On November 2, this lawsuit was filed. On November 7, the first Mormon service at the prison chapel was held. Services are now held weekly. During the six months since this suit was filed, attendance at the Mormon services has gradually declined. At the two services held in November, attendance averaged eighty inmates. In December, the average attendance was fifty-four; in January, thirty-five; in February, twenty-six; and in March, eighteen.

\* \* \* \* \* \*

The initial thrust of the complaint in this case was that plaintiffs had been denied the opportunity to worship as Mormons. Such a denial, if proven, would constitute a clear violation of the First Amendment. Despite the latitude accorded prison officials in the administration of prison affairs, the Supreme Court has clearly held that "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty." *Cruz v. Beto,* 405 U.S. 319, 322 n.2, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). The evidence here is that such reasonable opportunities are being afforded to the Mormon inmates at Fountain. Prison officials have contacted a local Mormon minister, who is leading services on a weekly basis. These opportunities are comparable to those afforded the other religious denominations and sects represented in the inmate population. In making this finding, the Court does not hold that this aspect of the case is moot. The general rule is that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i. e., does not make

the case moot." *United States v. W. T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Rather, the holding of the Court is that defendants did not violate the constitutional right of plaintiffs to worship as Mormons. The warden and, pursuant to his instructions, the chaplain acted promptly to obtain a minister and to schedule Mormon services once requested to do so by Stovall and other inmates. Plaintiffs do not contend that such efforts should have been made before there was a request, and certainly the Constitution does not mandate such initiative.

This conclusion, however, does not resolve the case. The evidence taken by deposition reveals that the core of plaintiffs' case is that they were threatened with the loss of benefits and, in fact, suffered the loss of benefits because they petitioned the chaplain and warden to permit Mormon services. Whether this alleged harassment was directed at plaintiffs because of their identity as Mormons or because of their action in petitioning, the legal issue is the same: whether the exercise of First Amendment rights was impermissibly restrained.

 The constitutional developments of the past decade render it indisputable that prisoners are not completely outside the embrace of the Constitution. In particular, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Among those First Amendment rights are the right to receive political publications, *Walker v. Blackwell,* 411 F.2d 23 (5th Cir. 1969); the right to engage in political writing without punishment, *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir. 1971); the right to correspond with legitimate representatives of the press, *Guajardo v. Estelle,* 580 F.2d 748 (5th Cir. 1978); the right to correspond with attorneys and officers of the court, *Taylor v. Sterrett,* 532 F.2d 462 (5th Cir. 1976); the right to furnish legal assistance to other inmates where the state fails to provide an alternative source of assistance, *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); and the right to engage in political discussions with other inmates, *Diamond v. Thompson,* 364 F.Supp. 659 (M.D.Ala.1973). Each of these facets of the First Amendment reflects a consistent principle: that prison authorities may not censor inmate speech "simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements." *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974); *Guajardo v. Estelle,* 580 F.2d, at 761; *The Luparar v. Stoneman,* 382 F.Supp. 495 (D.Vt.1974). It is a necessary corollary of this principle that prisoners have a right, subject to reasonable limitations of time and place, to petition prison authorities. In *Cruz v. Beto,* 319 U.S., at 321, 92 S.Ct., at 1081, the Supreme Court stated that "persons in prison, like other individuals, have the right to petition the Government for redress of grievances which, of course, includes 'access of prisoners to the courts for the purpose of presenting their complaints.'" Clearly the term "Government" encompasses prison authorities. Moreover, if prisoners have a right to file a complaint with the courts, then *a fortiori* they must have a right to lodge complaints with the prison authorities as a matter of first resort. *Cf. Givhan v. Western Line Consolidated School District,* —— U.S. ——, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). In *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 130 n. 6, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629 (1977), in upholding state regulations barring prisoners from soliciting other inmates to join the prisoners' union, the Supreme Court specially noted that, "The State has not hampered the ability of prison inmates to communicate their grievances to correctional officials." *See Durkin v. Taylor,* 444 F.Supp. 879, 883 (E.D.Va. 1977); *Paka v. Manson,* 387 F.Supp. 111, 118 (D.Conn.1974); *Collins v. Schoonfield,* 344 F.Supp. 257, 271 (D.Md.1972).

 The same cannot be said here. Chaplain Weber's speech, by threatening inmates who signed petitions with the loss of benefits, chilled the exercise of a vital

First Amendment right retained by prisoners. The Court need not speculate on the impact of the chaplain's "friendly advice." Each inmate who testified indicated that he understood the chaplain's comments as a threat of retaliation. Inmates Dillard, Chappel, and McMurtrey testified, in addition, that they knew of prisoners who had quit attending Mormon services for fear they would lose benefits. Corroboration comes from Chaplain Weber himself. He acknowledges that inmates came to him, saying they regretted signing the list "because we didn't really want to work against you." Intimidation of this sort is incompatible with the First Amendment. Prison officials need not go so far as to enact regulations forbidding inmates from petitioning for redress. First Amendment rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. Little Rock*, 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960), *quoted by, O'Connell v. Southworth*, 442 F.Supp. 182, 189 (D.R.I.1976) (distribution of leaflets by prisoners). A violation of First Amendment rights is shown where prison officials engage "in intimidation or harassment, including retaliation or deprivation of privileges when [prisoners] exercise the right to petition the Government for redress of grievances." *Dreyer v. Jalet*, 349 F.Supp. 452, 484–85 (S.D.Tex.1972); *Carothers v. Follette*, 314 F.Supp. 1014, 1022 (S.D.N.Y.1970). Such actions taken against prisoners for exercising their right to worship as Mormons would constitute an equally clear-cut violation of the First Amendment.

Weber pleads that he has been misunderstood. He would have his remarks interpreted, not as threatening the inmates with retaliation, but as recommending that they talk face-to-face with prison officials rather than petition them. While this may be all that Weber intended to say, the fact is that he said much more. Twice he said that prisoners who sign petitions should not expect to receive good time credit, transfers, or custody changes. Those benefits, he warned, would go "down the drain." The threat of retaliation was all the more pronounced because Weber was not offering advice in the abstract. His warning was explicitly made with reference to the list of inmates who had requested Mormon services. Moreover, the warning placed the inmates in a "no-win" situation. Weber advised them to bring problems directly to him. Yet the fact was that Stovall had addressed the chaplain face-to-face about Mormon services. He did not initially present the chaplain with a petition; on the contrary, it was Weber who insisted that Stovall back his request with names. Weber's "announcement" in chapel on October 26, then, can only be characterized as intimidation. The Court finds that he knew or should have known that his comments violated the First Amendment rights of the inmates at Fountain. *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).[3]

More difficult are plaintiffs' claims that the chaplain's threats have been realized. Plaintiff Stovall asserts that, upon filing this suit, three detainers were placed in his file, thus disqualifying him automatically for the work release for which he had been recommended. In addition, he has been denied good time credit although his prison record is clean, while other inmates with several disciplinaries have been awarded good time. Plaintiff Chappel alleges that he was given six months in lock-up on a charge of insubordination after the guards pointed out that he was "one of them damn Mormons." And plaintiff McMurtrey contends that his classification specialist informed him that he would not be "considered for transfer or nothing else as long as [his] name remained on the active list of 102." There is no evidence to corroborate these claims; but neither is there evidence to rebut them. The warden convincingly argues that he has not retaliated against

---

3. Defendants make no claim that a question of security or discipline was implicated by plaintiffs' request and petition. See *Pell v. Procunier*, 417 U.S. 817, 826, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Neal v. State of Georgia*, 469 F.2d 446, 450 (5th Cir. 1972).

any of the plaintiffs. And there is no evidence that the Commissioner has played any part in this affair. Fairly read, however, plaintiffs' allegations are that subordinate officials have carried out the retaliation. Those allegations have not been convincingly met. The only explanation offered for the timing of the detainers filed against Stovall is coincidence; and defendants have offered no explanation at all for the failure to award him good time. As to Chappel's disciplinary, defendants stated that the sentence was within the allowable range for the offense. They have offered no evidence, however, to answer the claim that the sentence was excessive and motivated by impermissible considerations. McMurtrey's classification specialist, Charles Blackledge, denied that he retaliated against McMurtrey in handling his request for transfer to Staton. He further testified that McMurtrey was not technically eligible for transfer to Staton. But he did not deny the specific allegation that he had informed McMurtrey that a transfer could be arranged if McMurtrey would have a detainer removed from his file and would obtain a letter from the warden of Staton, both of which tasks McMurtrey accomplished.

Plaintiffs' evidence is more suggestive than conclusive and meets their burden of proof only marginally, if at all. However, defendants' evasive responses warn against lightly dismissing plaintiffs' allegations. The Court is mindful of the limitations imposed on plaintiffs' presentation of evidence by the Magistrate's order of February 28, 1979, and of the fact that much of the evidence going to plaintiffs' claims of harassment is within the control of the defendants. The Court concludes therefore that, placed against the backdrop of Chaplain Weber's speech, as it must be, the evidence justifies the grant of limited injunctive relief. Plaintiffs are also entitled to an award of nominal damages from defendant Weber. Actual injury has not been proved, and compensatory damages will not be granted, nor will punitive damages. See *Carey v. Piphus*, 435 U.S. 247, 257 n. 11, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The Court will order defendants to conduct an immediate review of the files of the 102 inmates who petitioned the chaplain and warden to determine whether they have been impermissibly punished or whether they have been denied benefits or privileges to which they are entitled. In particular, defendants shall determine whether plaintiff Chappel's sentence for insubordination should be reduced; whether plaintiff McMurtrey should be transferred to Staton; and whether plaintiff Stovall should be granted good time and/or work release. The Court reminds defendants of its finding in *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala. 1976), that overly restrictive eligibility requirements for work release and other vocational opportunities are disfavored and of its order that such opportunities are to be afforded on the basis of individualized classification. An order will be entered accordingly.