UNITED STATES

v.

Roy Allen GODA, 197 42 1834, Aviation Storekeeper Third Class (E–4), U. S. Naval Reserve.

NMCM 81 1576.

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 21 Nov. 1980.

Decided 11 June 1982.

LT Earl B. Taylor, JAGC, USNR, Appellate Defense Counsel.

CDR Richard A. Monteith, JAGC, USN, Appellate Government Counsel.

LCDR John C. Vinson, JAGC, USN, Appellate Government Counsel.

Before CEDARBURG, Chief Judge, and GORMLEY and MAY, JJ.

CEDARBURG, Chief Judge:

Appellant was found guilty at a general court-martial, contrary to his pleas, of seven specifications alleging willful damage to Government aircraft, in violation of Article 108, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 908. Officer and enlisted members sentenced appellant to confinement at hard labor for 128 days and a

bad-conduct discharge. The convening authority approved the sentence as awarded.

## I

At trial, the defense moved for appropriate relief, requesting that the Article 32, UCMJ, investigation be reopened and that a new investigating officer's report be prepared. The defense argued that the existing report was deficient under paragraph 34*d, Manual for Courts-Martial, 1969 (Rev.)* (MCM), by failing to include either a verbatim transcript or a summarized record adopted under oath by the witnesses. The military judge, after lengthy discussions with counsel, denied the defense request, and we affirm that ruling.

Paragraph 69*c*, MCM, explicitly states that a motion for appropriate relief claiming Government noncompliance with the requirements of Article 32,

> should be granted only if the accused shows that the defect in the conduct of the investigation has in fact prevented him from properly preparing for trial or has otherwise injuriously affected his substantial rights.

Where the accused has been denied a substantial pretrial right, he is entitled to judicial enforcement, upon timely objection at trial. *United States v. Chuculate*, 5 M.J. 143 (C.M.A.1978). Thus reversible error has been found where the defense requested the presence of a key Government witness for purposes of cross-examination, *United States v. Ledbetter*, 2 M.J. 37 (C.M.A.1976); where the Article 32 was convened by an officer lacking proper authority, *United States v. Donaldson*, 23 U.S.C.M.A. 293, 49 C.M.R. 542 (1975); and where Article 27(b), UCMJ, 10 U.S.C. § 827(b), qualified counsel was not provided at the Article 32 hearing, *United States v. Mickel*, 9 U.S.C.M.A. 324, 26 C.M.R. 104 (1958). The *Manual* requires testimony taken under oath or affirmation, as some assurance as to the truthfulness of the testimony. *United States v. Samuels*, 10 U.S.C.M.A. 206, 27 C.M.R. 280 (1959). ▮ In contrast, the reference in paragraph 34*d*, MCM, to summarized testimony adopted by the witness under oath does not impose a mandatory procedure, but rather, is hortatory in nature. The procedure employed in the instant case provided the "thorough and impartial" hearing contemplated by the Code, and was consistent with the *Manual*'s recognition that the Article 32 procedure should be flexibly applied. *See* paragraph 34*a*, MCM. Given the liberal guidelines governing the use of prior inconsistent statements at trial, both for substantive purposes and for impeachment, it is difficult to perceive how the absence of summarized testimony adopted by witnesses impaired appellant's preparation for trial or infringed on his substantial rights. *See* Mil.R.Evid. 613 and 801.

## II

Appellant's second assignment of error challenges the admission of extrajudicial statements obtained by Norfolk, Virginia police. More specifically, appellant contends that his admissions were elicited without prior warnings required under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The military judge, following lengthy special findings, declined to impose a strict application of *Miranda*, and denied the defense motion to suppress. Our review of that ruling requires consideration of the facts established at trial.

On 17 July 1980, at or about 0300, appellant contacted the Norfolk police to report that he had been the victim of an abduction earlier that evening. Appellant explained to the detective responding to the report that he was frightened by the events of that night and wanted "to tell everything." Based upon the information obtained from appellant, Detective Emerson requested that appellant and his wife accompany him to Police Headquarters in order to assure their safety, and to utilize the superior stenographic and administrative facilities at Headquarters. At the same time, Emerson requested the assistance of a mobile crime lab to examine appellant's automobile and the scene of the alleged abduction.

Upon their arrival at Headquarters, appellant's wife was asked to remain outside

the Detective Bureau while appellant was escorted to an interview room within the Bureau spaces. Following two hours of questioning, a statement was reduced to writing and signed by appellant. According to appellant, his abduction stemmed from an incident on 11 July involving damage to Navy helicopters located at Hangar LP–12, Naval Air Station, Norfolk. Appellant explained that he had been questioned on 12 July by agents of the Naval Investigative Service (NIS) as the primary suspect after standing roving patrol watch on the night of the incident. At the NIS interview, appellant had been given his rights under Article 31, UCMJ, 10 U.S.C. § 831, and advice regarding counsel. He immediately terminated the interview to consult with counsel. Appellant indicated to Emerson that the individuals who had seized appellant had been involved in the damage to the helicopters and had warned appellant that his family would be killed should he make any statement to the authorities. During the entire preliminary conversation, Emerson omitted *Miranda* warnings, based upon his belief, somewhat dubious, that appellant was a victim, rather than a suspect.

Following his interview with appellant, Emerson contacted the NIS office to verify the information regarding the incident on 11 July. Emerson was told that aircraft had, in fact, been damaged, that appellant was the primary suspect, and that appellant had terminated the interview after being advised of his rights. At trial, Special Agent Reynolds testified that Emerson, during their phone conversation, indicated that appellant's account was not credible and that he intended "to break" the story of the abduction. Reynolds also testified that Emerson's assistance was not requested in connection with the investigation of the helicopter damage.

In light of the conversation with Special Agent Reynolds, Emerson became even more skeptical of appellant's claimed abduction. Those doubts were reinforced by the crime lab's report, received between 1015 and 1030. According to the investigator, appellant's claim that an unknown individual had forced his way into appellant's car or that appellant had been forced to a secluded area of the waterfront simply was not supported by the physical evidence examined. With the information gathered from NIS and the crime lab, Emerson decided to confront appellant.

From 1030 until 1100, appellant was quizzed on the apparent inconsistencies in his story. Faced with appellant's continued intransigence, Emerson announced at about 1100 that, in his opinion, the abduction story was fabricated and that he intended to obtain a warrant charging appellant with filing a false police report, a misdemeanor under Virginia law. Appellant's response was to ask what he could do to avoid jail. Emerson stated that he could tell the truth, and that while he could make no promises, he would try to help appellant. Appellant then acknowledged that the abduction story was false and that he had caused the damage to the helicopters on 11 July. Emerson asked appellant if he appreciated the significance of those comments and, based upon appellant's affirmative reply, asked whether he would make a statement. Throughout this conversation, appellant appeared to be very ill and physically uncomfortable.

The military judge, in his special findings, specifically concluded that from 1100 on, and at least before the admissions regarding the aircraft damage made to Emerson, appellant was in custody and not free to leave Police Headquarters. The special findings also noted that while Emerson's initial demeanor was relaxed and friendly, the relationship with appellant altered with the confrontation at 1030. The record is also clear that at no time was appellant formally informed of his *Miranda* rights, and certainly that information was withheld during the conversation which precipitated the confession at 1100. In the opinion of the military judge, Emerson's questions stemmed primarily from a desire to determine the truthfulness of the abduction story. Emerson acknowledged, however, that in his opinion sufficient evidence existed to convict appellant of the misdemeanor even without the confession.

■ The law clearly recognizes that where an individual is subject to custodial interrogation, an essential prerequisite is that he be advised of his right to remain silent and the consequences of exercising or waiving that right. *Miranda, supra* at 444, 467, 86 S.Ct. at 1612, 1624. That requirement is equally applicable where a service member is interrogated by civilian police acting independently of military authorities. *United States v. Temperly*, 22 U.S.C. M.A. 383, 47 C.M.R. 235 (1973). Thus *Miranda* is controlling in the case *sub judice*, if appellant was in custody and subject to police interrogation at the time of his confession. The military judge's findings of fact answer the first consideration in the affirmative.

■ From the record, it is apparent that the appellant's status at 1100 had changed from that of victim to that of suspect, based upon the crime lab report. By 1100, appellant's story was sufficiently suspicious to justify in Emerson's mind, an arrest warrant for making a false police report and restrictions on his freedom to leave the Detective Bureau. As the Supreme Court noted, it is enough that the individual is in custody or "otherwise deprived of his freedom of action in any significant way." *Miranda, supra* at 444, 86 S.Ct. at 1612. Appellant had reached such a status by 1100.

Similarly, Emerson's confrontation with appellant from 1030 to 1100, and particularly the comments immediately preceding appellant's admissions, constituted an interrogation. Warnings have been considered necessary whenever an individual is subjected to express questioning or where words or actions by police are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In recognizing the "functional equivalent" of a formal interrogation, the Court emphasized that the focus should be upon the perceptions of the suspect, and whether the incriminating statement was a foreseeable product of the words or actions used. *Id.* 100 S.Ct. at 1690. The questioning directed at appellant from 1030 on seems, at the very least, to represent the functional equivalent of an interrogation. Emerson's interrogation, together with the abrupt decision to secure an arrest warrant, could be expected to produce an incriminating statement, particularly after eight hours of interviews and given appellant's physical state. Recognizing the intimidating influence which accompanies any incommunicado questioning, appellant should have been afforded procedural safeguards effective to secure the privilege against self-incrimination. *Miranda, supra* at 444, 86 S.Ct. at 1612.

The Government at trial, argued that *Miranda* was inapplicable since appellant was suspected only of committing a misdemeanor. That rationale was rejected by the military judge and we find it equally unpersuasive. Where a service member is subjected to a nonmilitary interrogation, the applicable warning requirements will be those generally recognized in criminal trials in "the United States district courts." Mil.R.Evid. 305(h). An examination of federal case law, however, provides little, if any, guidance. The admission of incriminating statements was upheld in *Clay v. Riddle*, 541 F.2d 456 (4th Cir. 1976), where the accused was initially charged with driving while under the influence of intoxicants, a misdemeanor in Virginia. The majority in *Clay*, while citing state court decisions holding *Miranda* inapplicable in non-felonies, chose to emphasize the traffic offense involved, and concluded that warnings would not be required in that narrow class of offenses. That decision has since been criticized in *United States v. Schultz*, 442 F.Supp. 176 (D.Md.1977). There the court applied *Miranda* where the accused was first stopped by the police for reckless driving and then questioned at length regarding possible drug possession. The opinion noted that warnings were required, irrespective of the initial offense suspected, once police inquiries extended to possible crimes beyond the traffic offense, and questioning assumed a coercive characterization.

In light of the policy considerations underlying *Miranda*, the holding in *Schultz*

represents the more persuasive analysis. As that decision, and the dissent in *Clay*, point out, the controlling factor should not be the classification of the suspected offense, but rather the nature of the interrogation. While Detective Emerson may have been immediately concerned with resolving appellant's abduction claim, he was well aware that appellant was the primary suspect in the NIS investigation and that the two incidents were closely intertwined. Indeed, in the questioning leading to the statement regarding the abduction, subscribed by appellant at 0817, Detective Emerson specifically asked, "Mr. Goda, the obvious question, did you sabotage any aircraft or equipment at the Naval Air Station." Emerson could reasonably anticipate that any statement, incriminating or otherwise, would touch on areas involved in the NIS felony investigation.

Considering the objectives underlying the 1030 interrogation, and the potential for incrimination in a felony investigation, we find that the misdemeanor violation did not negate the need for proper warnings. As the Supreme Court has stated, "we find nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody." *Mathis v. United States*, 391 U.S. 1, 4–5, 88 S.Ct. 1503, 1505, 20 L.Ed.2d 381 (1968).

The military judge, in admitting appellant's confession absent *Miranda* warnings, held that under the unique facts in the instant case, the interrogation had not been "initiated" by Detective Emerson, but rather had flowed reasonably from appellant's initial police report. He concluded that appellant, by filing a knowingly false complaint, would not then be permitted to use *Miranda* as a shield. Under the facts presented, we believe that *Miranda* was controlling and that, absent proper warnings, appellant's statements were inadmissible. The United States Supreme Court has noted the importance of proper warnings as a mechanism to combat the pressures resulting from isolated interrogation and to allow full opportunity to exercise the right against self-incrimination. *Miranda, supra* 384 U.S. at 467, 86 S.Ct. at 1624. While appellant's status as victim, which characterized the investigation prior to 0930, might have negated many of those pressures, certainly Emerson had established appellant's status as the primary suspect in an NIS investigation, and had received indications from the crime lab that appellant's abduction claim was no longer credible. The conversation at 1030 clearly was an interrogation, and the interrelationship of the abduction and the helicopter damage made incriminating comments involving the latter incident reasonably foreseeable. This foreseeability necessarily justified complete warnings in accordance with *Miranda*.

The sequence of events culminating in appellant's confession, while unusual, should not overshadow the requirements established in *Miranda*. By emphasizing the need to inform an individual of his rights prior to custodial interrogation, the Supreme Court has obviated the need for an *ad hoc* inquiry into the actual voluntariness of any given admission. *California v. Prysock*, 453 U.S. 355, 101 S.Ct. 2806, 9 L.Ed.2d 696 (1981). "The rigidity of the *Miranda* rules and the way in which they are to be applied was conceived of and continues to be the decision's greatest strength." *Harryman v. Estelle*, 616 F.2d 870, 873–874 (5th Cir. 1980), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). That rationale is equally applicable in the instant case and requires reversal.

Accordingly, the findings and sentence are set aside. In view of the admissible evidence in the record supporting guilt, absent the improperly admitted confession, a rehearing may be ordered.

Judge GORMLEY and Judge MAY concur.